**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
ABILENE DIVISION**

| | | |
|---|---|---|
| **WILFRIDO I. ASCENCIO,** | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | Civil Action No. 1:04-CV-0236-C |
| | § | ECF |
| | § | Referred to the U.S. Magistrate Judge |
| **JO ANNE B. BARNHART,** | § | |
| **Commissioner of Social Security,** | § | |
| | § | |
| Defendant. | § | |

**REPORT AND RECOMMENDATION**

**THIS MATTER** is before the court upon Plaintiff's complaint filed October 5, 2004, for judicial review of the administrative decision of the Commissioner of Social Security denying Plaintiff's applications for a period of disability and disability insurance benefits under Title II of the Social Security Act. Plaintiff filed a brief in support of his complaint on August 29, 2005, Defendant filed her brief on September 27, 2005. The United States District Judge, pursuant to 28 U.S.C. § 636(b), referred this matter to the United States Magistrate Judge for report and recommendation, proposed findings of fact and conclusions of law, and a proposed judgment. This court, having considered the pleadings, the briefs, and the administrative record, recommends that the United States District Judge affirm the Commissioner's decision and dismiss the complaint with prejudice.

**I.    STATEMENT OF THE CASE**

Plaintiff filed an application for a period of disability and disability insurance benefits protectively on June 13, 2002, alleging disability beginning September 15, 1997. Tr. 17, 556-58.

Plaintiff's application was denied initially and upon reconsideration. Tr. 17, 559-62, 565-69. Plaintiff filed a Request for Hearing by Administrative Law Judge on March 4, 2003, and this matter came for hearing before the Administrative Law Judge ("ALJ") on September 23, 2003. Tr. 17, 34, 574-600. Plaintiff, represented by an attorney, testified in his own behalf. Tr. 578-93. Carol Bennett, a vocational expert ("VE"), appeared and testified as well. Tr. 593-600. At the hearing, Plaintiff requested that his alleged onset date be amended to June 16, 2000, the day after the date on which a prior disability application was denied by another ALJ. Tr. 17. The ALJ issued a decision unfavorable to Plaintiff on November 20, 2003. Tr. 14-28.

In his opinion the ALJ noted that the specific issue was whether Plaintiff was under a disability within the meaning of the Social Security Act. Tr. 17. He found that: Plaintiff met the disability insured status requirements through December 31, 2002. Tr. 17-18. Therefore, for entitlement to disability insurance benefits, Plaintiff's period of disability must be shown to have begun as of or prior to that date. Tr. 17. Plaintiff had not engaged in substantial gainful activity at any time since June 16, 2000, his amended alleged disability date  Tr. 18. Plaintiff has "severe" impairments, including severe post-traumatic stress disorder ("PTSD"), degenerative disk disease, noninsulin-dependent diabetes mellitus ("NIDDM"), arthritic knee pain, right hip and bilateral shoulder bursitis, and diagnosed borderline intellectual functioning. *Id.* Plaintiff also had hypertension, benign prostatic hypertrophy, and an inguinal hernia, which were not "severe" impairments. *Id.* Plaintiff's severe impairments, singularly or in combination, were not severe enough to meet or equal in severity any impairment listed in the Listing of Impairments, 20 C.F.R. Part 404, Subpt. P, App. 1. *Id.* Therefore, the ALJ was required to determine whether Plaintiff retained the residual functional capacity ("RFC") to perform her past relevant work or other work existing in the national economy.

The ALJ discussed Plaintiff's Veterans Administrative ("VA") benefits for PTSD, as well as his treatment thought the VA for PTSD, including inpatient voluntary hospitalization. Tr. 18. He discussed Plaintiff's treatment from a psychologist, as well as from a VA psychiatrist for depression and PTSD. Tr. 19. The ALJ noted: Plaintiff complained of chronic low back pain, arthritic pain in his knees, and bilateral shoulder pain, for which he was treated by his primary care provider. *Id*. Plaintiff reported traveling and participating in a cookoff, as well as traveling and cooking for participants in PTSD patient groups. *Id*. Plaintiff reported increased depression because of the holidays in December 2000 and in January 2001 reported that his back pain was worsened by yard chores and mopping. *Id*. Objective tests, including x-rays and a CT scan were performed, and Plaintiff was advised to lose weight and exercise, as well as continue taking his nonsteroidal anti-inflammatory pain medication. *Id*.

The ALJ noted Plaintiff's report in February 2001 to his treating psychiatrist that he was happy with his current psychotropic medications and that he had no side effects from them. *Id*. He also described Plaintiff's March and June 2001 psychological and psychiatric treatment and the opinion of an assessing psychiatrist, who opined that Plaintiff had no more than moderate symptoms of PTSD, as well as a Global Assessment of Functioning ("GAF")$^1$ score on Axis V$^2$ of 60$^3$. Tr. 19-

---

$^1$   The GAF score on Axis V is for reporting the client's "psychological, social, and occupational functioning." *See American Psychiatric Assoc., Diagnostic and Statistical Manual of Mental Disorders* (4th ed. 1994) at 32 ("DSM-IV"). This report of overall functioning is noted to be "useful in planning treatment and measuring its impact, and in predicting outcome." *Id*.

$^2$   The axial system of evaluation enables the clinician to comprehensively and systematically evaluate a client. *See generally, American Psychiatric Assoc., Diagnostic and Statistical Manual of Mental Disorders* (4th ed. 1994) at 25-30.

$^3$   The DSM-IV defines a GAF score of 51-60 as moderate symptoms (e.g. flat effect, circumstantial speech, and occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g. few friends, conflicts with peers or co-workers). *American Psychiatric Assoc., Diagnostic and Statistical Manual of Mental Disorders* (4th ed. 1994) at 32.

20.  He noted Plaintiff's August 2001 report to his treating psychiatrist indicating that he was feeling "a little better," with a medication change.  Tr. 20.   He noted that Plaintiff reported that his back pain worsened and became "unbearable" after mowing for 50 minutes and was also exacerbated by walking one to two blocks.  *Id*.   Radicular pain was noted, as was some limitation in range-of-motion testing.  *Id*.   The ALJ noted that Plaintiff was prescribed medication and exercise in November 2001 by his primary care physician, who further opined that Plaintiff's tenderness of the right hip was probably "a trochanteric bursitis."  *Id*.  A neurosurgeon opined that Plaintiff had minimal foraminal narrowing at L4-5 and L5-S1.  *Id*.

The ALJ noted that Plaintiff underwent a bladder ultrasound in January 2002 and was examined by an orthopedist in February 2002.  Tr. 20.  Plaintiff also saw his psychologist in March 2002, underwent an opthalmalogic evaluation, and was also examined by a urologist.  Tr. 21.

The ALJ discussed a letter from Plaintiff's treating psychologist, which indicated that Plaintiff was very depressed, with a frequently elevated anxiety level, and a significant level of anger, as well as symptoms such as frequent nightmares, flashbacks, sleep disturbances, guilt, and a continuous need to withdraw and isolate from others.  *Id*.  He noted that the treatment notes of the psychologist consistently indicated that Plaintiff had few complaints, was getting along well with family and friends, was able to travel to visit with other veterans, and had assisted other patients by transporting them to the VA facility.  *Id*.  The ALJ indicated that he declined to accept the treating source opinion of the psychologist set forth in the letter, insofar as it was not supported by the psychologist's own treatment notes or by any other clinical evidence in the record.

The ALJ noted Plaintiff's voluntary in-patient treatment in July 2002.  Tr. 21-22.  He also noted Plaintiff's subsequent treatment at the VA center in August 2002 indicating that Plaintiff was somewhat "content and happy."  Tr. 22.

The ALJ also noted that: Plaintiff underwent a consultative psychological evaluation in September 2002. *Id*. The consultative examiner ("CE"), a psychologist, administered an intelligence test, which indicated that Plaintiff had a verbal IQ score of 70, a performance IQ of 79, and a full scale IQ of 72. *Id*. The CE found that Plaintiff's verbal comprehension fell within the borderline range, and his perceptual organizational abilities appeared to be in the low average range. *Id*. The CE's opined that these findings "appeared lower than his presentation," which may be "due in part to his report of having spoken both English and Spanish in the home" while growing up. *Id*. The CE reported that achievement scores indicated that Plaintiff was able to read at the high school equivalent, with spelling at the fourth grade level and arithmetic at the fifth grade level. Tr. 22. The CE opined that Plaintiff's true cognitive skills may be higher than the IQ score reflected, and he diagnosed Plaintif with PTSD with borderline intellectual functioning characterized by moderate symptoms with a GAF score of 58. *Id*.

The ALJ discussed why he found that Plaintiff's hypertension, benign prostate hypertrophy, and inguinal hernia were not "severe" impairments. Tr. 23. He also further discussed his finding that Plaintiff did not meet the criteria of severity for any impairment in the Listing of Impairments. *Id*. The ALJ specifically noted that there was no evidence demonstrating or supporting a conclusion that Plaintiff had borderline intellectual functioning prior to age 22, as required to meet the criteria of Section 12.05C of the Listing of Impairments. *Id*. The ALJ noted that Plaintiff had graduated from high school and had performed skilled work activity on a sustained basis and also noted that various psychological and psychiatric evaluations had failed to demonstrate any overt cognitive deficits. Tr. 23-24. He noted that Plaintiff had grown up in a bilingual household which may have, as noted by the psychological CE, affected his verbal comprehension scores and may have resulted in inaccurate intelligence score results. *Id*. The ALJ therefore found that, based on the evidence as a whole, Plaintiff had not met or equalled in severity Section 12.05C. Tr. 24.

The ALJ acknowledged that in making the RFC assessment, he must consider all symptoms, including pain, and the extent to which these symptoms can be reasonably accepted as consistent with the objective medical evidence and other evidence, based on the requirements of Social Security Ruling 96-7p. Tr. 25. The ALJ found that during the relevant period, Plaintiff had impairments which could reasonably be expected to produce the type of pain he alleged. Tr. 24. However, the ALJ found that Plaintiff's subjective complaints suggested a greater degree of impairment than was established by the objective medical evidence. *Id*. In so finding, the ALJ noted that he had considered the Plaintiff's activities of daily living; his reports of pain and other symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of the medications Plaintiff took to alleviate his pain and other symptoms; Plaintiff's treatment other than medication for relief of his pain and other symptoms; other palliative measures taken; and various other factors concerning functional limitations and restrictions imposed by pain and other symptoms. Tr. 24-25.

The ALJ found that Plaintiff did have pain and a psychological impairment which caused some functional limitations but further found that based on the evidence in the record, Plaintiff's statements concerning his impairments and their impact on his ability to work were only partially credible. Tr. 25. In so finding, the ALJ compared Plaintiff's report of his symptoms with his testimony and with the treatment and progress notes of his care providers. *Id*. He also found that Plaintiff had provided exaggerated and misleading testimony regarding his hernia surgery and prostate problems. *Id*. Viewing the record as a whole, the ALJ found that Plaintiff had exaggerated both the severity and nature of his subjective complaints, and he specifically found his allegation that he was unable to engage in any work activity at all through December 31, 2001, was not credible. *Id*.

The ALJ found that Plaintiff could not return to his past relevant work as a telemarketer, sales representative, insurance salesperson, and a day laborer. Tr. 18, 26. He noted that Plaintiff was considered an individual closely approaching advanced age and had a 12th grade education. Tr. 26; *see* 20 C.F.R. §§ 404.1653, 404.1564.

The ALJ found that between June 16, 2000, and December 31, 2002, Plaintiff retained the RFC to perform, on a continuing and sustained basis, the exertional and nonexertional requirements of light work activity, limited to jobs that did not require more than occasional stooping, crouching, crawling, kneeling, or climbing stairs and ramps; that did not require balancing or climbing scaffolds, ladders, and ropes; that did not require sitting for more than 30 minutes at one time without the opportunity to stand in addition to a lunch and normal legal breaks during the work day; that did not require standing/walking for more than 4 hours out of an 8-hour work day; that did not require maintaining fixed concentration and attention for periods of longer than 20 minutes without the opportunity to refocus for a minute or two and come back to fixed concentration; that did not require carrying out more detailed, non-complex instructions; that did not require more than superficial interaction with coworkers; and that did not require public contact. Tr. 25. Having found that Plaintiff could not perform the full range of light work, the ALJ turned to the testimony of the VE in determining whether Plaintiff was capable of making a vocational adjustment to other work despite his severe impairments. Tr. 26-27.

The ALJ relied upon the testimony of the VE who indicated that a hypothetical person of Plaintiff's age, with Plaintiff's RFC and vocational history, could perform work which exists in the national economy, including the jobs of assembler, with 8,100 jobs in Texas and 141,000 jobs nationally; and hand packer, with 5,000 jobs in Texas and 100,000 jobs nationally. Tr. 27. The ALJ, therefore, concluded that Plaintiff was not disabled within the meaning of the Social Security Act at any time through the date of his decision. Tr. 27-28.

Plaintiff submitted a Request for Review of Hearing Decision/Order on December 11, 2003. Tr. 9-12. After granting a 25-day extension to present additional evidence, the Appeals Council issued its opinion on September 24, 2004, indicating that although it had considered the contentions raised in Plaintiff's Request for Review and the additional evidence, it nevertheless concluded that there was no basis for changing the ALJ's decision and denied Plaintiff's request. Tr. 3-8. The ALJ's decision, therefore, became the final decision of the Commissioner.

On October 5, 2004, Plaintiff commenced this action which seeks judicial review of the Commissioner's decision that Plaintiff was not disabled.

## II.  STANDARD OF REVIEW

An individual may obtain a review of the final decision of the Commissioner by a United States District Court. 42 U.S.C. § 405(g). The court's review of a denial of disability benefits is limited to determining whether the decision is supported by substantial evidence and whether the Commissioner applied the proper legal standards. *Waters v. Barnhart*, 276 F.3d 716, 718 (5th Cir. 2002)(citing *Estate of Morris v. Shalala*, 207 F.3d 744, 745 (5th Cir. 2000)). Substantial evidence "is more than a mere scintilla and less than a preponderance" and includes "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Masterson v. Barnhart*, 309 F.3d 267, 272 (5th Cir. 2002); *Watson v. Barnhart*, 288 F.3d 212, 215 (5th Cir. 2002). The court will not re-weigh the evidence, try the questions *de novo*, or substitute its judgment for the Commissioner's, even if the court believes that the evidence weighs against the Commissioner's decision. *Masterson,* 309 F.3d at 272. "[C]onflicts in the evidence are for the Commissioner and not the courts to resolve." *Id.* (quoting *Newton v. Apfel,* 209 F.3d 448, 452 (5th Cir. 2000)).

In order to qualify for disability insurance benefits or supplemental security income, a claimant has the burden of proving that he or she has a medically determinable physical or mental impairment lasting at least 12 months that prevents the claimant from engaging in substantial gainful

activity. Substantial gainful activity is defined as work activity involving significant physical or mental abilities for pay or profit. *Newton,* 209 F.3d at 452; *see* 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1527(a)(1).

The Commissioner follows a five-step process for determining whether a claimant is disabled within the meaning of the Social Security Act. 20 C.F.R. § 404.1520; *Masterson*, 309 F.3d at 271; *Newton*, 209 F.3d at 453. In this case, the ALJ found at step 5 that Plaintiff was not disabled because he retained the ability to perform work in the national economy. Tr. 26-28.

### III.   DISCUSSION

Plaintiff claims that the ALJ's decision and his determination of Plaintiff's RFC is not supported by substantial evidence because the ALJ erred by failing to find that Plaintiff's severe mental impairment, specifically his borderline intellectual functioning, did not meet or equal Section 12.05C of the Listing of Impairments and by failing to fully and fairly develop the record as to whether Plaintiff's borderline intelligence had occurred while he was in high school.

The ultimate issue is whether the ALJ's decision is supported by substantial evidence. The court, therefore, must review the record to determine whether it "yields such evidence as would allow a reasonable mind to accept the conclusion reached by the ALJ." *Loza v. Apfel,* 219 F.3d 378, 393 (5th Cir. 2000).

Plaintiff alleges that the evidence of record demonstrates that he has met or equaled the criteria of § 12.05C of the Listing of Impairments. Section 12.05 of the Listing of Impairments, dealing with mental retardation, defines this impairment as "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22." 20 C.F.R. Pt. 404, Subpt. P, App. I, § 12.05. This section indicates that presumptive disability under the Listing of Impairments is established "when the requirements in A, B, C, or D

are satisfied." *Id*. The criteria of Section 12.05(C) include a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function. 20 C.F.R. Part 404, Subpt. P, App. 1, § 12.05C. "A claimant must prove both of these conditions in order to meet his burden under step three." *Selders v. Sullivan*, 914 F.2d 614, 619 (5th Cir. 1990) (citing *Sullivan v. Zebley*, 110 S. Ct. 885, 891-92 (1990)). "The claimant must provide medical findings that support each of the criteria for the equivalent impairment determination." *Selders*, 914 F.2d at 619 (citing 20 C.F.R. § 404.1526(a)).

Plaintiff notes that he has a verbal IQ score of 70 and another impairment which imposes additional and significant work-related limitations of function, specifically PTSD. Plaintiff argues that the record only indicates that he completed high school. Plaintiff further argues that the ALJ improperly relied upon his work as an insurance salesman to demonstrate his level of functioning. He argues that he only did the job for six months in 1998 and having earned only $267.14, he clearly "did not learn how to perform the job."

The ALJ noted that testing indicated that Plaintiff was functioning in the borderline range, with a verbal IQ of 70, a performance IQ of 79, and a full scale IQ of 72. Tr. 22. He discussed these findings and also noted testing which indicated that Plaintiff functioned at the fourth grade level for spelling, at the high school level for reading, and at the sixth grade level for arithmetic. *Id*. He specifically addressed the issue of meeting or equaling the criteria of Section 12.05C. Tr. 23-24. He noted that there was no evidence demonstrating or supporting a conclusion of intellectual functioning at the borderline level prior to reaching the age of 22 years. Tr. 23. He noted Plaintiff's work at the skilled level, his completion of high school, the fact that numerous psychiatric and psychological evaluations failed to determine such functioning or cognitive deficits, as well at the CE's own indicating that the verbal scores may have been artificially low because of Plaintiff's bilingual upbringing. Tr. 24. The ALJ therefore found that Plaintiff's medically determinable

-10-

impairments did not meet or equal in severity any impairment listed in the Listing of Impairments. Tr. 24.

Plaintiff argues that he has met the requirements of Section 12.05C of the Listing of Impairments, having shown a "valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function." 20 C.F.R. Pt. 404, Subpt. P, App. II, § 12.05C. Plaintiff argues that the ALJ was required to obtain medical expert testimony to determine whether his impairments met the criteria of Section 12.05C, thereby establishing presumptive disability.

Section 12.00(A) describes the structure for evaluation of mental impairments under § 12.05 of the Listing of Impairments:

> The structure of the listing for mental retardation (12.05) is different from that of the other mental disorders listings. Listing 12.05 contains an introductory paragraph with the diagnostic description for mental retardation. It also contains four sets of criteria (paragraphs A through D). If your impairment satisfies the diagnostic description in the introductory paragraph and any one of the four sets of criteria, we will find that your impairment meets the listing.

*See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(A). Section 12.05 clearly provides that in order to meet the Listing criteria for mental retardation, a claimant's mental impairment must first satisfy the diagnostic criteria – that is, "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period . . . ." 20 C.F.R. Pt. 404, Subpt. P, App. I, § 12.05.

The Commissioner's *Programs Operations Manual System* ("*POMS*"),[4] describes the relationship of adaptive behavior to IQ scores. *See POMS* § DI 24515.056(D)(2). This section notes:

---

[4] The POMS may be found at the Social Security Administration Policy Information Site, located at: http://policy.ssa.gov/poms.nsf/partlist!OpenView.

> The term "adaptive behavior" refers to the individual's progress in acquiring mental, academic, social, and personal skills as compared with other unimpaired individuals of his/her same age. Indicators of adaptive behavior include childhood development milestones (e.g., when did the individual first crawl, walk, tie shoes, feed/dress self, etc.), as well as educational and social achievements. The judgment of an MC [medical consultant] is necessary to affirm that adaptive behavior is consistent with IQ test results.

*POMS* § DI 24515.056(D)(2).

Section 12.00(D)(6) further describes the role that intelligence tests play in evaluating mental retardation for a determination of presumptive disability, noting that "[t]he results of standardized intelligence tests may provide data that help verify the presence of mental retardation or organic mental disorder, as well as the extent of any compromise in cognitive functioning. However, since the results of intelligence tests are only part of the overall assessment, the narrative report that accompanies the test results should comment on whether the IQ scores are considered valid and consistent with the developmental history and the degree of functional limitation." 20 C.F.R. Pt. 404, Subpt. P, App. I, § 12.00(D)(6)(a). Thus, although Plaintiff argues that his verbal IQ score is sufficient to meet the criteria of 12.05C, IQ tests alone do not demonstrate "significantly subaverage general intellectual functioning with deficits in adaptive functioning." Plaintiff's IQ scores form a part of the data necessary to verify the presence of mental retardation but function as "only part of the overall assessment." *See* 20 C.F.R. Pt. 404, Subpt. P, App. I, § 12.00(D)(6). The Eighth Circuit found, for example, that an ALJ may reject IQ scores that are inconsistent with a claimant's daily activities and behavior, especially when the scores are based on a one time examination by a nontreating psychologist. *See Clark v. Apfel*, 141 F.3d 1253, 1255 (8th Cir. 1998)(finding the ALJ properly rejected IQ scores that were the product of one meeting with a non-treating psychologist and were inconsistent with claimant's daily activities, and no medical records indicated that she was mentally retarded prior to age 22); *see also, Muse v. Sullivan*, 925 F.2d 785, 790 (5th Cir. 1991); *Popp v. Heckler*, 779 F.2d 1497, 1499 (11th Cir. 1986).

Plaintiff further argues that medical expert testimony is necessary to determine whether his verbal IQ score, combined with his other impairments, meets or equals Section 12.05C in severity. While evaluation of the consistency of IQ scores and adaptive behavior is an issue for a medical consultant, the ALJ may properly consider the opinions of such consultants with the claimant's activities and work history. *Compare POMS*, § DI 24515.056(D)(2) with *Higgins v. Barnhart,* 288 F. Supp. 2d 811, 819 (S.D. Tex. 2002)(citing *Villa v. Sullivan*, 895 F.2d 1019, 1024 (5th Cir. 1990))(finding that the claimant's ability to work as a housekeeper, despite her mental limitations, constituted additional *indicia* militating against a finding that her adaptive functioning was deficient to a degree that would be reasonably considered disabling).  The *POMS* provides that "Listing 12.05C is based on a combination of an IQ score with an additional significant mental or physical impairment. The criteria for this paragraph are such that a medical equivalence determination would very rarely be required." *POMS* § DI 24515.056 (D)(1)(c).  In any case, Section 12.00(D)(6) indicates that ALJ should consider the narrative report that accompanies the test results, which should comment on whether the IQ scores are considered valid and consistent with the developmental history and the degree of functional limitation. 20 C.F.R. Part 4, Subpt. P, App. 1, § 12.00(D)(6).  The ALJ, in his opinion, specifically discussed these very issues, and the record reflects that the psychological CE had opined that Plaintiff's intelligence test scores "appeared lower than his presentation would suggest which may be due in part to his report of having spoken both English and Spanish in the home." Tr. 316.  Indeed, the CE further opined that Plaintiff's report of English as a second language in school, suggested "the possibility of his true cognitive skills being higher than the WAIS III reflected." *Id*.  The CE also opined that other test results "suggested achievement scores at or above current measured IQ." *Id*.

The ALJ found that there was no evidence demonstrating an onset of Plaintiff's mental impairment prior to age 22. Tr. 23.  He noted Plaintiff's work history, which included semi-skilled

and skilled work. Tr. 24. In so doing, he relied upon the testimony of the VE, who indicated that she had reviewed Plaintiff's records describing his past work. Tr. 593. Plaintiff argues that he did not perform skilled work for a long enough period to have learned how to perform the job. The ALJ relied on the testimony of the VE, who indicated that Plaintiff had worked at the semi-skilled and skilled level and who further noted that Plaintiff had performed the insurance salesman job during two different time periods. Tr. 594-95. In any case, Plaintiff had also performed semi-skilled work. Tr. 594. "The value of a vocational expert is that he is familiar with the specific requirements of a particular occupation, including working conditions and the attributes and skills needed." *Vaughan v. Shalala,* 58 F.3d 129, 132 (5th Cir. 1995). Thus, the ALJ was justified in relying on the VE's testimony.

The psychological CE specifically indicated that Plaintiff's IQ scores likely reflected his history of no formal education and bilingual upbringing. Tr. 315-17. He also noted Plaintiff's report of graduating from high school, repeating the second grade due to not knowing English, and no history of resource classes. Tr. 315. The CE noted Plaintiff's report of being able to care of his own personal need and hygiene, maintaining a driver's licence, and his ability to read. Tr. 317. This is consistent with other evidence in the record, such as Dr. E. John Civello's opinion that Plaintiff's "IQ appears to be about average as judged by vocabulary and complexity of concepts." Tr. 85. Moreover, despite Plaintiff's extensive psychological and psychiatric treatment records and evaluations, his treating sources have not noted borderline intellectual functioning, made any Axis II diagnoses, or indicated cognitive deficits.

"The ALJ as factfinder has the sole responsibility for weighing the evidence and may choose whichever physician's diagnosis is most supported by the record." *Muse v. Sullivan*, 925 F.2d 785, 790 (5th Cir. 1991)(citing *Bradley v. Bowen*, 809 F.2d 1054, 1057 (5th Cir. 1987)). The task of weighing the evidence is the province of the ALJ. *Chambliss v. Massanari*, 269 F.3d 520, 523 (5th

Cir. 2001). The relative weight to be given these pieces of evidence is within the ALJ's discretion. *Id.* The ALJ properly exercised his responsibility as factfinder in weighing the evidence and in determining that Plaintiff's mental impairment did not meet or equal in severity Section 12.05C of the Listing of Impairments. His decision is supported by substantial evidence in the record.

Plaintiff argues that the ALJ erred by failing fully and fairly develop the record by obtaining evidence necessary to determine whether Plaintiff's borderline intellectual functioning had developed which he was in high school. However, Plaintiff bears the burden at the first four steps of the sequential analysis. *Leggett v. Chater*, 67 F.3d 558, 564 (5 Cir. 1995).

Clearly, the ALJ has a duty "'to develop the facts fully and fairly relating to an applicant's claim for disability benefits.'" *Boyd v. Apfel*, 239 F.3d 698, 708 (5th Cir. 2001)(quoting *Newton*, 209 F.3d at 458). The claimant has the burden to prove that he is disabled within the meaning of the Social Security Act. *Fraga v. Bowen*, 810 F.2d 1296, 1301 (5th Cir. 1987). The court may not reverse the decision of an ALJ for failure to fully and fairly develop the record unless the claimant shows that he or she was prejudiced by the ALJ's failure. *Carey v. Apfel*, 230 F.3d 131, 142 (5th Cir. 2000)(citing *Brock v. Chater*, 84 F.3d 726 (5th Cir. 1996)). In order to establish prejudice, a claimant must demonstrate that he or she "could and would have adduced evidence that might have altered the result." *Carey*, 230 F.3d at 142 (quoting *Kane v. Heckler*, 731 F.2d 1216, 1220 (5th Cir. 1984)). This court will not reverse for a failure to develop the record unless Plaintiff can show that he was prejudiced as a result. Plaintiff has failed to show that he could and would have adduced evidence that would have altered the ALJ's decision and has thus failed to demonstrate prejudice. Therefore, the ALJ did not err by failing to develop the record.

## IV. CONCLUSION

Based upon the foregoing discussion of the issues, the evidence, and the law, this court recommends that the United States District Judge affirm the Commissioner's decision and dismiss the Plaintiff's complaint with prejudice.

The United States District Clerk shall serve a true copy of these findings, conclusions, and recommendation on the parties. Pursuant to Title 28, United States Code, Section 636(b)(1) and Rule 4 of Miscellaneous Order No. 6, For the Northern District of Texas, any party who desires to object to these findings, conclusions, and recommendation must serve and file written objections within 11 days after being served with a copy. A party filing objections must specifically identify those findings, conclusions, or recommendation to which objections are being made. The District Court need not consider frivolous, conclusory, or general objections. A party's failure to file such written objections to these proposed findings, conclusions, and recommendation shall bar that party from a *de novo* determination by the District Court. *See Thomas v. Arn*, 474 U.S. 140, 150, 106 S. Ct. 466, 472 (1985). Additionally, any failure to file written objections to the proposed findings, conclusions, and recommendation within 11 days after being served with a copy shall bar the aggrieved party from appealing the factual findings and legal conclusions of the United States Magistrate Judge that are accepted by the District Court, except upon grounds of plain error. *See Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996) (en banc).

DATED this 1st day of September, 2006.

_____
**PHILIP R. LANE**
**UNITED STATES MAGISTRATE JUDGE**